USDC SCAN INDEX SHEET

















SWD   3/2/05    16:04

3:05-CV-00420   SEC V. CHRISTIE

*1*

*CMP.*

ORIGINAL

FILED

05 MAR -2  AM 10: 32

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

*Jody*

BY:_____  DEPUTY

1  MICHAEL A. PIAZZA, *pro hac vice*
   MOLLY M. WHITE, Cal. Bar No. 171448
2  DIANA K. TANI, Cal. Bar No. 136656
   FINOLA HALLORAN, Cal. Bar No. 180681
3  RONNIE B. LASKY, Cal. Bar No. 204364

4  Attorneys for Plaintiff
   Securities and Exchange Commission
5  Randall R. Lee, Regional Director
   Sandra J. Harris, Associate Regional Director
6  Briane Nelson Mitchell, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
7  Los Angeles, California 90036-3648
   Telephone:  (323) 965-3998
8  Facsimile:  (323) 965-3908

9

10                  **UNITED STATES DISTRICT COURT**

11                **SOUTHERN DISTRICT OF CALIFORNIA**

12                                    '05 CV 0420 JM    (JFS,

13  SECURITIES AND EXCHANGE          Case No.
    COMMISSION,
14                                    **COMPLAINT FOR VIOLATIONS**
                Plaintiff,            **OF THE FEDERAL SECURITIES**
15                                    **LAWS**
         vs.
16
    SANDRA MILLER CHRISTIE,
17
                Defendant.
18

19       Plaintiff Securities and Exchange Commission ("Commission") alleges as

20  follows:

21                   **JURISDICTION AND VENUE**

22       1.    This Court has jurisdiction over this action pursuant to Sections 20(b),

23  20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

24  §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of

25  the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

26  78u(d)(3)(A), 78u(e) & 78aa.  Defendant has, directly or indirectly, made use of

27  the means or instrumentalities of interstate commerce, of the mails, or of the

28  facilities of a national securities exchange, in connection with the transactions,

1    acts, practices, and courses of business alleged in this Complaint.

2         2.     Venue is proper in this district pursuant to Section 22(a) of the

3    Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

4    § 78aa, because certain of the transactions, acts, practices, and courses of conduct

5    constituting violations of the federal securities laws occurred within this district.

6    **SUMMARY**

7         3.     This is a financial fraud case involving Advanced Marketing Services,

8    Inc. ("AMS"), a San Diego-based wholesaler of general interest books that

9    provides other book-related services, including advertising.  From at least 2000 to

10   2003, AMS manipulated its earnings to meet Wall Street analysts' expectations

11   and made misleading disclosures in its periodic reports, through at least two

12   fraudulent schemes related to its advertising services.  Defendant Sandra Miller

13   Christie ("Christie"), the former Vice President of AMS's advertising department,

14   was one of the individuals who instigated and participated in the fraudulent

15   schemes.

16        4.     In the first fraudulent scheme, AMS improperly manipulated its

17   earnings by producing fewer advertising vehicles than it had contracted with

18   publishers to provide.  One advertising service that AMS provides to publishers is

19   to print and mail advertising vehicles -- such as inserts, catalogs, and post-cards --

20   for books the publishers produce.  AMS improperly recognized revenue on the full

21   quantity of advertising vehicles that it had agreed to distribute, because it did not in

22   fact produce the number of vehicles that it had contracted to produce.

23        5.     In the second fraudulent scheme, AMS improperly increased its

24   reported earnings by reversing certain liabilities when it was not entitled to do so.

25   AMS had accrued a liability for credits that it expected its retail customers to take

26   for certain advertising and promotional services that those customers provided.

27   When the retail customers did not take the credits that were due to them, instead of

28   contacting the retailers and reconciling the amounts of the credits, Christie and

1  others directed advertising and sales personnel to hide the discrepancies from the

2  retailers.  Christie then directed accounting personnel to reverse the liability, which

3  in turn reduced expenses, thereby ensuring that the advertising department

4  achieved or exceeded its budget.

5       6.     Christie knew that the inflated advertising department numbers had a

6  significant impact on AMS's bottom line and that the numbers would impact

7  AMS's financial statements.  Christie profited from the fraudulent schemes

8  through her annual bonuses and through her sales of AMS stock during the

9  relevant period.

10       7.     As a result of the defendant's improper actions, from the fourth

11  quarter of fiscal year 2002 through the fourth quarter of fiscal 2003, AMS met or

12  exceeded analysts' earnings estimates every quarter except one.

13       8.     As alleged more specifically below, Christie violated the antifraud,

14  record-keeping, and books and records provisions of the federal securities laws,

15  and Christie aided and abetted AMS's violation of the record-keeping and

16  reporting requirements of the federal securities laws.  By this complaint, the

17  Commission seeks to enjoin Christie from future violations of the federal securities

18  laws, to obtain disgorgement of all benefits Christie received from her violations,

19  to obtain civil penalties, and to prohibit Christie from serving as an officer or

20  director of a publicly traded company.

21                                **THE DEFENDANT**

22       9.     Sandra Miller Christie, age 50, resides in Palm Springs, California.

23  Christie began working at AMS in 1986 and was promoted to Vice President of

24  Advertising in October 1997.  As Vice President of Advertising, Christie was an

25  officer of the company, and was responsible for the advertising department.  AMS

26  terminated Christie in May 2004.

27  / / /

28  / / /

**RELATED ENTITY**

10.    AMS is a Delaware corporation, headquartered in San Diego, California.  AMS is a wholesaler of general interest books to membership warehouse clubs, specialty retailers, e-commerce companies, and traditional book stores.  AMS's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and has been listed on the New York Stock Exchange under the ticker symbol "MKT" since November 2000.  Before then, AMS's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was traded on the Nasdaq National Market System under the symbol "ADMS."

**BACKGROUND**

11.    AMS purchases books from a variety of publishers on a returnable, wholesale basis and resells them to retailers, which include book stores and wholesale clubs.  In addition to being a wholesale distributor of books, AMS provides other services to its customers, including product-selection advice, merchandising and product development services, distribution services, and advertising and promotion services.

12.    In AMS's most recently filed periodic report for the fiscal year ended March 31, 2003, AMS reported pre-tax earnings of $18 million and revenues of $911 million.  From fiscal year 2001 to 2003, AMS's revenues grew from $713 million to $911 million.

13.    Although AMS's promotion and advertising services constituted just two to three percent of AMS's revenue, the advertising department accounted for at least 20% of AMS's pre-tax earnings, primarily due to the large profit margins generated by AMS's advertising department.

A.    **AMS's Reporting Obligations and Public Announcements**

14.    As a public company, AMS was required to comply with federal statutes, rules, and regulations to maintain public trading of its stock and to sell its

4

1   securities to the public.

2       15.   These statutes, rules, and regulations required AMS to, among other

3   things: (a) make and keep books, records, and accounts, which, in reasonable

4   detail, accurately and fairly reflected its transactions and dispositions of assets;

5   (b) devise and maintain a system of internal accounting controls sufficient to

6   provide reasonable assurances that the transactions were recorded as necessary to

7   permit preparation of financial statements in conformity with Generally Accepted

8   Accounting Principles ("GAAP") or any other criteria applicable to such

9   statements and to maintain accountability for assets; (c) file with the Commission

10   quarterly reports on the appropriate form (known as a "Form 10-Q") including

11   financial statements containing the company's balance sheets and statements of

12   income and cash flows prepared in conformity with GAAP; (d) file with the

13   Commission annual reports on the appropriate form (known as a "Form 10-K")

14   including financial statements containing the company's balance sheets and

15   statements of income and cash flows prepared in conformity with GAAP; and

16   (e) file with the Commission periodic reports that did not make any untrue

17   statement of material fact or omit to state a material fact necessary in order to make

18   the statements made, in the light of the circumstances under which they were

19   made, not misleading.

20       16.   As part of the Management's Discussion and Analysis section of

21   AMS's Forms 10-Q and 10-K, AMS management was required to discuss and

22   analyze the Company's financial condition, changes in its financial condition, and

23   results of operations, with a specific focus on material events and uncertainties

24   known to management that would cause reported financial information not to be

25   necessarily indicative of future operating results or future financial condition.

26   AMS's management was thus required specifically to disclose known trends or

27   uncertainties that have had or that they reasonably expected would have a natural

28   favorable or unfavorable impact on net sales revenues or income from continuing

1   operations.

2       17.    Under GAAP and the Commission's rules and regulations, AMS

3   recorded and reported net income for specific periods (i.e., at the end of each

4   quarter and at the end of its fiscal year).  AMS's fiscal year began April 1 and

5   ended March 31.  In fiscal year 2001, AMS's first quarter ended June 30, 2000; its

6   second quarter ended September 30, 2000; its third quarter ended December 31,

7   2000, and its fiscal year ended March 31, 2001.  In AMS's fiscal year 2002, its

8   first quarter ended June 30, 2001; its second quarter ended September 30, 2001; its

9   third quarter ended December 31, 2001, and its fiscal year ended March 31, 2002.

10  For AMS's fiscal year 2003, AMS's first quarter ended June 30, 2002; its second

11  quarter ended September 30, 2002; its third quarter ended December 31, 2002, and

12  its fiscal year ended March 31, 2003.

13      18.    In addition to filing quarterly and annual reports with the

14  Commission, AMS also issued earnings press releases and held conference calls

15  with analysts and investors to discuss AMS's financial performance on a periodic

16  basis, usually after the end of a quarter and before AMS made its periodic filings

17  with the Commission.

18      19.    Under GAAP and the Commission's rules and regulations, AMS

19  could recognize revenue from the advertising services it provided once AMS

20  substantially completed the advertising services it was supposed to perform in

21  order to be entitled to those revenues.

22      20.    Under GAAP and the Commission's rules and regulations, AMS

23  should accrue and record a liability when the underlying obligation to provide an

24  asset or service was deemed probable and reasonably estimable.  GAAP also

25  requires that a recognized liability be measured at the amount initially recorded

26  until an event that changes the liability or its amount occurs.

27  / / /

28  / / /

## B.   Cooperative Advertising

21.   Virtually all of AMS's advertising revenue was generated though cooperative ("coop") advertising programs, pursuant to which publishers make available advertising dollars to promote their books.  AMS participates in two types of coop advertising programs:  1) wholesale coop advertising; and 2) retail coop advertising.

22.   Wholesale coop advertising is a program through which publishers offer a pool of funds directly to AMS to be used to promote the publishers' books to industry insiders, such as store managers and book buyers employed by retailers. The funds that publishers make available to AMS for wholesale coop advertising are generally based on AMS's prior year's net purchases.  Before using the funds, AMS is required to obtain publisher approval.  Thus, when AMS develops an advertising concept, it sends the publisher an advertising request.  Once the publisher approves the advertising request, it becomes a contract between AMS and the publisher.  After AMS creates the artwork, prints the vehicle, and directs a mailing house to distribute the advertising vehicle, AMS invoices the publisher for the advertising vehicle and recognizes revenue for that service.

23.   Retail coop advertising is similar to wholesale coop, except that the funds are made available for use by a retailer (instead of a wholesaler) to advertise books to end-consumers (instead of industry insiders).  The amount of retail coop funds that a publisher makes available to a particular retailer usually is based on the retailer's net purchases of that publisher's titles.  Similar to wholesale coop, either AMS or the retailer creates an advertising concept.  If the retailer and AMS agree on the advertising concept, AMS sends an advertising request to the publisher.  Upon receiving the publisher's approval, AMS creates the artwork, prints the advertising vehicle, directs a mailing house to mail the advertisement to the end-customers, and bills the publisher.

/ / /

24.   A retailer is not required to obtain advertising from AMS with coop advertising funds.  Because retail coop dollars belong to the retailers, there are instances when retailers do not spend their retail coop dollars with AMS, but provide all or some of the promotional service themselves.  In instances where the retailers provide the advertising service, many retailers will invoice the publisher through AMS, because in addition to creating advertisements, AMS keeps an accounting of the retail coop funds and provides publishers with the sales information necessary to calculate the funds available to the retailer.  When a retailer decides to use its retail coop dollars for a particular promotion using AMS, it notifies AMS that this is how it intends to use its retail dollars.  AMS then obtains approval from the publisher.  Once the publisher approves the promotion, AMS communicates the approval to the retailer and invoices the publisher.  The retailer is then supposed to invoice AMS for the service.  In this way, some advertising costs are "passed through" AMS from the retailers to the publishers.

### THE FRAUDULENT SCHEMES

25.   For at least the past three fiscal years, AMS manipulated its pre-tax earnings and made misleading disclosures in public filings, press releases, and conference calls, through different fraudulent schemes involving both its wholesale coop and retail coop advertising programs.

**A.   Quantity Reductions**

26.   In 2000, the advertising department was at risk of failing to meet its budget.  As a result, Christie and other advertising personnel devised and implemented a scheme to reduce quantities, so that the advertising department would make or exceed its budget.  Christie and other advertising personnel decided they could meet the budget by cutting their costs, and that they could cut costs by printing fewer advertising vehicles than they had agreed by contract to provide their publishers.  This practice evolved into a regular course of business in the department.

8

27.    Beginning in 2000 and continuing into 2003, in order to meet the advertising budget and respond to pressure from AMS senior executives for greater earnings, the advertising department routinely printed and distributed fewer advertising vehicles than AMS had contracted to provide.  This occurred in both the wholesale and the retail coop programs.  Initially, Christie decided which advertising vehicles should be cut, and by how much.  Christie instructed others in the advertising department to obtain quotes from printers for various print quantities and to provide that information to Christie, so Christie could decide the amount of vehicles to reduce.  Christie and others instructed individuals in the advertising department to print fewer advertising vehicles than AMS had contracted with its publishers to print, without changing the quantity or payment terms on the contracts with the publishers.

28.    For example, in the wholesale coop context, by at least September 2000, AMS was informing publishers that its circulation for one of its wholesale advertising vehicles, "Pages" magazine, was 100,000 when it was substantially less.  In September 2000, AMS printed only 55,000 copies of "Pages," even though AMS's contracts with publishers and AMS's webpage indicated that the circulation was 100,000.  In some months, AMS printed as few as 8,000 copies of "Pages."

29.    Similarly, in the retail coop context, AMS systematically sent advertising postcards to fewer warehouse club members than it had agreed to provide in AMS's contracts with the publishers.  For example, in about March 2000, AMS informed publishers that it would send one SAM's Club post card to 200,000 of SAM's Club's members, but AMS only printed 50,000 of those cards.

30.    Reducing quantities became such standard business practice that the advertising department made little attempt to hide the practice.  All documentation pertaining to a particular advertising vehicle, including the advertising contracts, the invoices from the printer, and the mailing house invoices, was kept in one

1    promotion folder.  As an advertising promotion was processed, the promotion

2    folder was passed from person to person in the advertising department and

3    ultimately provided to Christie's direct subordinate, who approved the vehicles by

4    signing the outside of the folders before they were provided to the accounting

5    department.  A signature on the promotion folder indicated to the accounting

6    department that AMS could invoice the publisher for the vehicle.

7        31.    The advertising department's deliberate quantity reductions from

8    contracted amounts caused a revenue recognition practice that was improper under

9    GAAP because AMS failed to substantially accomplish its duties under its

10   contracts -- namely to produce the agreed-upon number of advertising vehicles.  As

11   a result, AMS overstated its earnings, and its quarterly and annual financial

12   statements did not conform with GAAP.

13   **B.    Improper Accrual Reversals**

14       32.    AMS inflated its advertising income by improperly reversing accrued

15   liabilities related to retail coop advertising.  As previously alleged, when a retailer

16   provided all or part of an advertising service and the advertising cost was "passed

17   through" AMS to the publisher, AMS would invoice the publisher for the cost of

18   the promotion and wait for the retailer to take a credit on its book purchases from

19   AMS.  Because the retailer was owed a credit, AMS would record an offsetting

20   liability for the anticipated credit in an accrued liability account called "accrued

21   coop."  When a retailer used the credit, AMS credited the retailer and reduced the

22   corresponding "accrued coop" liability.

23       33.    Retailers often failed to take credits for their advertising costs.  This

24   was largely due to a lack of communication between the retailers' sales personnel,

25   who arranged for the various promotions, and the retailers' accounting group,

26   which invoiced those services.  Thus, there often were discrepancies between AMS

27   accruals and retailers deductions.

28   / / /

1    34.    From at least 2000, Christie used the coop accrued liabilities to meet

2  or exceed the advertising budget without reaching settlement with any of the

3  retailers.  When the end of a quarter drew near, Christie asked the person in the

4  accounting department who was responsible for coop advertising to provide her

5  with a list of outstanding coop accruals.  Christie would identify which accrued

6  liabilities should be removed from the "accrued coop" account, even though AMS

7  had not reached settlements with the retailers regarding those accruals.  Then,

8  Christie asked the coop advertising accountant to verify that none of the identified

9  accruals had been taken as the result of a retailer taking a credit.  If retailers had

10  taken some of the identified accruals, the coop advertising accountant would

11  communicate that to Christie, who would then identify other accruals that should

12  be reversed to income.  In this way, Christie created the false appearance that the

13  advertising department was making or exceeding its budget.  Initially, Christie

14  reversed accruals in lump sums at the end of the quarters, but over time, Christie

15  began reversing accruals throughout the quarter.  By reversing the accrued liability,

16  AMS reduced the corresponding expense on its income statement, thereby

17  overstating earnings.

18    35.    In order to maximize the pool of "accrued coop" from which Christie

19  drew to meet budget, AMS adopted the practice of intentionally refraining from

20  providing retailers information about the credits due to them.  The often-repeated

21  motto among AMS executives was "we are not our customers' accounting

22  departments."  In other words, if the retailers did not accurately track the credits

23  due to them, AMS was not going to help.  As the coop advertising accountant

24  stated in an email:  "Our policy has always been . . . WE NEVER ISSUE A

25  CREDIT TO A CUSTOMER UNTIL THEY TAKE IT."  Christie directed

26  individuals in AMS's advertising and sales departments to withhold from AMS's

27  retailers information about credits due to them, even when retailers called AMS to

28  ask about outstanding credits.  As a result of this conduct, Christie assured that

11

1  there was no documentation to support the accrual reversals.

2    36.   AMS did not have any policies outlining the procedures for the

3  reversal of coop accruals that retailers did not utilize.   Christie knowingly caused

4  coop accounting accruals to be reversed to income, by identifying which accruals

5  should be reversed and directing the coop advertising accountant to reverse the

6  accruals, even though she knew that there was no documentation supporting the

7  reversals.

8    37.   The advertising department's reversal of coop accruals did not

9  conform to GAAP.  Although AMS initially properly recorded the coop accrued

10  liabilities, the advertising department improperly reduced those liabilities and the

11  corresponding expenses without contacting retail customers or attempting to reach

12  settlement with them, in an effort to manipulate the advertising department's

13  earnings, and ultimately AMS's earnings.  These reductions in the coop accrued

14  liability account were improper because no corresponding event occurred that

15  changed the amount of the liability.  Rather, they were arbitrarily and improperly

16  reversed at the direction of Christie and others in the advertising department.  As a

17  result, AMS's quarterly and annual financial statements did not conform with

18  GAAP.

19  **C.**   **Pressure to Meet Budget**

20    38.   As an officer of AMS, Christie knew that it was important to AMS's

21  senior executives that AMS meet or exceed earnings-per-share estimates.  Christie

22  and other corporate officers attended regular officer meetings, at which AMS's

23  financial performance and anticipated results were discussed.  At the officer

24  meetings, a senior officer repeatedly expressed concern that AMS achieve its

25  quarterly earnings-per-share target.  The minutes of one such meeting, which

26  Christie attended, state, "We need to do everything we can to bring EPS up to the

27  lower level of what we gave the street: $.03 - .07."  Materials distributed at the

28  officer meetings sometimes showed the forecasted contribution of the advertising

1    department, as compared to AMS's net income and estimated earnings per share.

2        39.    As an officer of AMS, Christie presented the advertising department's

3    financial information to the Board of Directors in connection with AMS's strategic

4    planning process.  Developing budgets was a key component of the strategic

5    planning process.  The various vice presidents, including Christie, were responsible

6    for preparing the initial drafts of the budgets for their departments.  Those drafts

7    were then reviewed and revised by upper management and ultimately approved by

8    the Board of Directors.  By the end of the budgeting process, the advertising

9    department's budgeted income was increased by about 15% each year, even

10   though the amount of available coop funds remained relatively constant.  A senior

11   officer visited Christie's office at the end of each quarter to pressure her to make

12   the ever-increasing advertising department budget.

13       40.    In order to keep track of how the advertising department was

14   performing as compared to budget, Christie kept a "crib sheet," which was updated

15   at least weekly.  The "crib sheets" tracked AMS's actual profit on individual

16   advertising promotions, by retailer and month, and compared that number to the

17   budgeted monthly profit for each retailer.  The spreadsheets also included a line

18   item reflecting coop advertising accrual reversals.  Christie provided the crib sheet

19   to a more senior AMS officer on a weekly basis.

20   **D.    Scienter**

21       41.    Christie had the requisite scienter.  Christie devised and helped carry

22   out the two fraudulent schemes for the sole purpose of manipulating the

23   advertising department's results, so it would appear that the advertising department

24   was making or exceeding budgeted income.  The decision to instigate the fraud

25   was primarily the result of pressure from AMS executives for additional

26   advertising income.

27       42.    As an officer of AMS, Christie knew that the advertising department's

28   financial performance impacted AMS's financial statements, and that the financial

1    information was shared with the public.  Christie also knew that her fraudulent

2    conduct caused AMS's quarterly and annual reports to contain false and

3    misleading information.  When AMS issued its earnings press releases, Christie

4    and others discussed the fact that the press releases said nothing about the

5    advertising department's contribution to AMS's bottom line.

6    **E.    Materiality**

7        43.    Christie's fraudulent conduct had a material impact on AMS's

8    financial statements.  By producing fewer advertising vehicles than contracted, and

9    by improperly reversing coop advertising accruals, Christie caused AMS to

10   improperly inflate its earnings.  Because the advertising department accounted for

11   nearly 20% of AMS's pre-tax earnings, the impact was sizeable.  The estimated

12   overstatement of pre-tax earnings was 9% in fiscal year 2001, 10% in fiscal year

13   2002, and 19% in fiscal year 2003.

14   **F.    Christie Profited During the Fraud**

15       44.    Christie profited from her participation in the schemes.  During the

16   relevant period, Christie received annual bonuses, and exercised options and sold

17   shares of AMS stock.

18       45.    As a corporate officer, Christie's bonus was based on AMS's net

19   income as compared to budget.  The bonus was set up on a sliding scale, so the

20   better AMS's actual results as compared to budget, the larger Christie's bonus.

21   Because of the high profit margins in the advertising department, the department's

22   performance had a significant impact on net income, and consequently on

23   Christie's bonus.  In fiscal year 2001, AMS achieved 107% of its budgeted net

24   income, and Christie received a $42,120 bonus.  In fiscal year 2002, AMS

25   achieved 94% of its budgeted net income, and Christie received a $25,000 bonus.

26   Christie did not receive a bonus in 2003.

27       46.    During her perpetration of the fraud, Christie executed and sold stock

28   options through her brokerage account.  On February 6, 2001, she exercised 1,575

1  options at $4.96, which she then sold at $20.43 per share for a total profit of

2  $24,365.  On January 29, 2002, Christie exercised 213 options at $3.31, which she

3  sold at $23.00 per share for a total profit of $4,193.  Christie's total profit during

4  the relevant period was $28,558.  At the time Christie exercised these options and

5  sold these shares, the price of AMS stock was inflated due to AMS's overstated

6  earnings, which was caused in part by Christie's misconduct.

7       47.    When Christie sold her AMS stock, she knew that AMS's publicly

8  available earnings were materially overstated.

9  **FIRST CLAIM FOR RELIEF**

10  **FRAUD IN THE OFFER OR SALE OF SECURITIES**

11  **Violations of Section 17(a) of the Securities Act**

12       48.    The Commission realleges and incorporates by reference ¶¶ 1 through

13  47 above.

14       49.    Defendant Christie, by engaging in the conduct described above,

15  directly or indirectly, in the offer or sale of securities by the use of means or

16  instruments of transportation or communication in interstate commerce or by use

17  of the mails:

18          a.    with scienter, employed devices, schemes, or artifices to

19          defraud;

20          b.    obtained money or property by means of untrue statements of a

21          material fact or by omitting to state a material fact necessary in order

22          to make the statements made, in light of the circumstances under

23          which they were made, not misleading; or

24          c.    engaged in transactions, practices, or courses of business which

25          operated or would operate as a fraud or deceit upon the purchaser.

26       50.    By engaging in the conduct described above, defendant Christie

27  violated, and unless restrained and enjoined will continue to violate, Section 17(a)

28  of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR
### SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder

51.     The Commission realleges and incorporates by reference ¶¶ 1 through 47 above.

52.     Defendant Christie, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.     employed devices, schemes, or artifices to defraud;

    b.     made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

53.     By engaging in the conduct described above, defendant Christie violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC
### REPORTING REQUIREMENTS

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act,
and Rules 12b-20, 13a-1 and 13a-13 thereunder**

54. The Commission realleges and incorporates by reference ¶¶ 1 through 47 above.

55. AMS violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, by filing with the Commission materially false and misleading quarterly and annual reports on Form 10-Q and Form 10-K for the first through third quarters of 2001, 2002, and 2003, and for year-end 2001, 2002, and 2003.

56. Defendant Christie knowingly provided substantial assistance to AMS's violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

57. By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendant Christie aided and abetted AMS's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

## FOURTH CLAIM FOR RELIEF

### RECORD-KEEPING VIOLATIONS

**Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act
and Violations of Rule 13b2-1 thereunder**

58. The Commission realleges and incorporates by reference ¶¶ 1 through 47 above.

/ / /

59. AMS violated Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1, thereunder, by failing to make or keep books, records, and accounts in reasonable detail that accurately and fairly reflected its transactions and disposition of its assets and by falsifying or causing to be falsified AMS's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.

60. Defendant Christie knowingly provided substantial assistance to AMS's violation of Section 13(b)(2)(A) of the Exchange Act.

61. By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendant Christie aided and abetted AMS's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

62. By engaging in the conduct described above, defendant Christie violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing to be falsified AMS's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act. Unless restrained and enjoined, defendant Christie will continue to violate Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

### FIFTH CLAIM FOR RELIEF
### BOOKS AND RECORDS VIOLATIONS
#### Violations of Section 13(b)(5) of the Exchange Act

63. The Commission realleges and incorporates by reference ¶¶ 1 through 47 above.

64. By engaging in the conduct described above, defendant Christie violated Section 13(b)(5) of the Exchange Act, by circumventing or failing to implement a system of internal accounting controls, or by knowingly falsifying any book, record or account described in Section 13(b)(2) of the Exchange Act. Unless restrained and enjoined, defendant Christie will continue to violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that defendant Christie committed the alleged violations.

### **II.**

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining defendant Christie and her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

### **III.**

Order defendant Christie to disgorge all ill-gotten gains from her illegal conduct, together with prejudgment interest thereon.

### **IV.**

Order defendant Christie to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### **V.**

Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting defendant Christie from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

/ / /

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  March 2, 2005

RONNIE B. LASKY
Attorney for Plaintiff
Securities and Exchange Commission

**ORIGINAL**

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | SANDRA MILLER CHRISTIE |

05 MAR -2 AM 10: 31

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)    RIVERSIDE COUNTY |
|---|---|
| | BY _____ DEPUTY |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

**'05 CV 0420 JM     (JFS)**

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Ronnie B. Lasky  323-965-3998<br>SEC/Pacific Regional Office<br>5670 Wilshire Blvd., 11th Floor<br>Los Angeles, CA 90036-3648 | Marc R. Greenberg  562-436-2000<br>Keesal, Young & Logan<br>400 Oceangate, P.O. Box 1730<br>Long Beach, CA 90801-1730 |

| II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY) | | III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) | | |
|---|---|---|---|---|
| | | (For Diversity Cases Only) | | |

☒ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY) The Complaint alleges violations of the federal securities laws. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5 thereunder; 15 U.S.C. § 78m(a) & 17 C.F.R. §§ 240.12b-20, 240.13a-1, & 240.13a-13; aiding & abetting violations of 15 U.S.C. § 78m(b)(2)(A) & 17 C.F.R. § 240.13b2-1; 15 U.S.C. § 78m(b)(5).

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 790 Other Labor Litigation | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint:<br>JURY DEMAND: ☐ YES ☒ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE Marilyn L. Huff | Docket Number 04 CV 1966 H (POR) |
|---|---|---|

DATE 3/2/05          SIGNATURE OF ATTORNEY OF RECORD _Ronnie B. Lasky_

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

CF $250.00   3/2/05   #141599 ID   Voided Receipt VA